IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID LEE STIGALL, | ) | CASE NO. 1:14-cv-01600 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff David Lee Stigall ("Plaintiff" or "Stigall") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 14.   As explained more fully below, the ALJ

failed to properly weigh and/or explain the weight assigned to the medical opinion evidence,

including the opinions of Dr. Evillo Domingo, M.D., Stigall's treating physician.  Accordingly,

the Court **REVERSES and REMANDS** the Commissioner's decision.

## I.  Procedural History

Stigall protectively filed[1] applications for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") on May 11, 2011.[2]  Tr. 18, 228-229, 230-236, 256.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 8/11/2015).

[2] Stigall had previously filed applications for DIB and SSI on October 28, 2008, and November 14, 2008, respectively.  Tr. 18.  The Administrative Law Judge ("ALJ") considered the May 11, 2011, application an implied request to reopen the prior determinations but found no basis to reopen them.  Tr. 18.   Plaintiff acknowledges the ALJ's finding regarding reopening but indicates that he made no request to reopen.  Doc. 15, p. 1.

Stigall alleged a disability onset date of date of October 12, 2007.  Tr. 18, 230, 256.  He alleged disability due to hypotension, light headedness, vertigo, and depression.  Tr. 66, 79, 137, 146, 154, 161, 260.  Stigall's applications were denied initially (Tr. 137-145, 146-152) and upon reconsideration (Tr. 154-160, 161-167).  Stigall requested an administrative hearing.  Tr. 168-169.  On February 22, 2013, Administrative Law Judge Ben Barnett ("ALJ") conducted an administrative hearing.  Tr. 36-63.

In his March 15, 2013, decision, the ALJ determined that Stigall had not been under a disability from October 12, 2007, through the date of the decision.  Tr. 15-35.  Stigall requested review of the ALJ's decision by the Appeals Council.  Tr. 14.  On June 20, 2014, the Appeals Council denied Stigall's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational and vocational evidence

Stigall was born in 1957.  Tr. 27, 228, 230.  He completed school through the 11th grade and in 2003 received some training in telecommunications.  Tr. 261.  Stigall is married and lives with his wife and children.  Tr. 261, 280, 400.  Stigall last worked in 2007 as a chemical etcher.[3] Tr. 51, 52-55, 269, 645.  He stopped working in October 2007 after "feeling very dizzy and blurry" while on a ladder at work.  Tr. 645.  He gradually came down from the ladder and was treated at the emergency room. Tr.  645.  Thereafter, as discussed more fully below, he underwent testing and sought treatment through various medical providers for his lightheadedness and dizziness.  Tr. 645.

### B.    Medical evidence

#### 1.  Treatment history

---

[3] He also has worked as a chemical machinist, line laborer, and telecommunications installer.  Tr. 268.

Dr. Evillo Domingo, M.D., is Stigall's primary care physician.  Tr. 42.  After feeling lightheaded and dizzy, Stigall was seen at Mercy Hospital's emergency room on October 15, 2007.  Tr. 342-347, 349-360.  Stigall's CT brain scan showed no significant abnormality.  Tr. 356-359.  The emergency room physicians advised Stigall that he would be off work for at least one week; he should avoid sudden changes of position; he should avoid bending and prolonged standing or rolling in bed; he should wear pressurized stockings; should increase his fluid and salt intake; and should consider a tilt table test.  Tr. 351.  On October 18, 2007, a tilt table test was performed.  Tr. 363.  The test was positive with a diagnosis of orthostatic hypotension.  Tr. 363.  Dr. Domingo ordered a bilateral carotid scan, which was performed on October 24, 2007.  Tr. 361.  The bilateral carotid scan showed "only mild plaque . . . present with no hemodynamically significant stenosis.  Antegrade flow in the vertebrals."  Tr. 361.

Dr. Domingo referred Stigall to Dr. Raymond Baddour, M.D., for a neurological evaluation and, on May 5, 2008, Stigall saw Dr. Baddour.  Tr. 521-522.[4]  Stigall reported having episodes of disequilibrium since October 2007 that could persist for days but fluctuated in severity.  Tr. 521.  Stigall indicated that, along with the disequilibrium, he experienced numbness and tingling in his lips.  Tr. 521.  Stigall also reported that he had experienced periods of unconsciousness lasting several seconds.  Tr. 521.  Stigall indicated that he had tried Florinef for his hypotension but discontinued the medication because he did not see improvement in his symptoms.[5]  Tr. 521.  Dr. Baddour's physical examination findings were generally normal.  Tr. 522.  Dr. Baddour's impression was that Stigall's symptoms might be due to a peripheral vestibulopathy.  Tr. 520.  Dr. Baddour recommended an MRI, an EEG, and lab work and he started Stigall on Antivert.  Tr. 522.

---

[4] Dr. Baddour's May 5, 2008, record is also located in the record at Tr. 397-398.

[5] He also had tried Zoloft for suspected anxiety and depression but indicated it did not help.  Tr. 521.

Stigall saw Dr. Baddour on May 30, 2008, and reported that the Antivert was not helping. Tr. 520.  Dr. Baddour noted that Stigall's May 8, 2008, EEG, and May 21, 2008, brain MRI (Tr. 514) were normal and his lab work was unremarkable.  Tr.  520.  Dr. Baddour discontinued the Antivert and started Stigall on Klonopin.  Tr. 520.  Stigall saw Dr. Baddour for a follow-up visit on June 27, 2008.  Tr. 505.  Dr. Baddour indicated that Klonopin was discontinued because it caused over-sedation and a brief hospitalization.  Tr. 505.  Dr. Baddour noted that Stigall had a normal head CT scan on June 18, 2008.  Tr. 505.  Dr. Baddour indicated that he "suspect[ed] that [Stigall] may have an underlying anxiety disorder as the cause or contributing factor to his symptoms."  Tr. 505.  Dr. Baddour started Stigall on citalopram, ordered a heavy metal screen and planned to review Stigall's serum sodium, B12, and folate levels.  Tr. 505.

Dr. Domingo also referred Stigall to a cardiologist.  Tr. 364.  On September 2, 2008, Stigall saw Dr. Robert Drake, D.O., at Mid-Ohio Heart Clinic.  Tr. 364-366.  Stigall reported that his lightheadedness and dizziness occurred while he was sitting, lying or standing and at any time of the day or night.  Tr. 364.  He stated that his symptoms were worse with stress.  Tr. 364. Stigall indicated that he fell a couple of times but denied losing consciousness.  Tr. 364.  Stigall reported left-sided non-radiating chest pain that occurred with exertion or when he was anxious. Tr. 364.  He reported some mild shortness of breath, occasional heart palpitations, and occasional mild ankle edema.  Tr. 364.  He indicated that his chest pain lasts for several minutes and slowly resolves.  Tr. 364.  Dr. Drake indicated that an EKG performed in his office showed "normal sinus rhythm with borderline criteria for left ventricular hypertrophy."  Tr. 366, 367-368.  Dr. Drake's impression was chronic hypotension, probably secondary to an autonomic nerve imbalance; chest pain; and weight loss.  Tr. 366.  With respect to Stigall's hypotension, Dr. Drake indicated that Stigall had had some improvement with salt and fluid intake and Stigall was

not interested in taking either midodrine or Florinef. Tr. 366. Dr. Drake discussed with Stigall changing his diet to get more carbohydrates and to add vegetables. Tr. 366.

Stigall saw Dr. Drake again on September 29, 2008. Tr. 369-371. Dr. Drake indicated that Stigall's "[c]ardiac evaluation shows normal LV function with mild plaque disease in the coronaries. Echocardiogram is overall normal." Tr. 369. Stigall was still getting lightheaded and dizzy but reported some improvement with his increased salt and fluid intake. Tr. 369. Stigall denied "chest pain, chest pressure, palpitations, syncope, near syncope, diaphoresis or ankle edema." Tr. 369. Dr. Drake's impression was neurocardiogenic syncope probably secondary to autonomic imbalance; chronic hypotension; and mild plaque disease. Tr. 369. Dr. Drake recommended continuing Stigall on increased salt and fluid. Tr. 370. Stigall was still not interested in midodrine or Florinef. Tr. 370. He preferred to try natural medicines first. Tr. 370. Dr. Drake started Stigall on fish oil and cinnamon capsules and indicated that, if Stigall's symptoms persisted, he would consider starting Stigall back on midodrine. Tr. 370.

 In April 2010, Stigall saw Dr. Domingo with complaints of constant, sharp stomach pain. Tr. 428-429. Stigall reported that he was continuing to get lightheaded and dizzy but without loss of consciousness. Tr. 428. Dr. Domingo's assessments included abdominal pain and orthostatic hypotension/dizziness/lightheadedness. Tr. 429. A June 2010, abdominal ultrasound revealed no issues with Stigall's liver or gallbladder. Tr. 446. Stigall complained of right shoulder problems in July 2010. Tr. 431. Stigall had right shoulder and chest x-rays done on July 14, 2010, (Tr. 441, 443), showing mild to moderate osteoarthritic changes in the right AC joint and glenohumeral joint (Tr. 441) and no active cardiopulmonary disease (Tr. 443).[6]

In December 2010, a renal kidney ultrasound was performed due to complaints of incontinence. Tr. 440. The ultrasound was unremarkable. Tr. 440. In January 2011, Dr.

---

[6] A February 2011, chest x-ray also revealed no active pulmonary disease. Tr. 535.

Domingo referred Stigall to a urologist, Dr. Gregory Cook, M.D., for benign prostatic hypertrophy (BPH).  Tr. 586-588.  In discussing treatment options with Stigall, Dr. Cook noted that Stigall "gets dizzy easily, and has low blood pressure.  I hesitate to utilize alpha blockers." Tr. 587.  Therefore, Dr. Cook recommended and performed a cystoscopy rather than prescribe alpha blockers.  Tr. 589-590.  Thereafter, on March 3, 2011, Dr. Cook performed a cystoscopy with transurethral resection of the prostate.  Tr. 566, 570-573.

In November 2011, Dr. Domingo treated Stigall for depression.  Tr. 643, 688.  Dr. Domingo indicated that Stigall's mood was depressed but he had no suicidal ideation or plan to commit suicide.  Tr. 643.  Zoloft was prescribed.  Tr. 643. Dr. Domingo continued to treat Stigall in 2012 and 2013 for various medical conditions.  Tr. 684-685, 689-693.  On January 23, 2013, Stigall saw Dr. Domingo with complaints of "deafness" in both ears.  Tr. 691-692.  Stigall described his condition as "being in a barrel of water" with ringing in his ears.  Tr. 691.  Dr. Domingo assessed conductive deafness and middle ear effusion and recommended consideration of a hearing test if Stigall did not improve in a month or if his condition worsened.  Tr. 692.

On June 6, 2012, Stigall saw Dr. Cook with complaints of back pain.  Tr. 654-656.  Dr. Cook ordered a CT scan of Stigall's abdomen and pelvis , which showed no evidence of renal, ureteral, or bladder calculi; no acute process; mild ectasia of the abdominal aorta and the iliac vessels; and mild degenerative facet arthropathy of the lower lumbar spine.  Tr. 652-653.

**2.  Opinion evidence**

**a.  Treating source**

Stigall's treating physician Dr. Domingo rendered two opinions: the first on December 2, 2008 (Tr. 386-388), and the second on February 11, 2013 (Tr. 694-695).

_December 2, 2008, opinion_

In his December 2, 2008, opinion, Dr. Domingo indicated that he had been treating Stigall since March 23, 2006.  Tr. 387.  Dr. Domingo's diagnosis was "dizziness; orthostatic hypotension."  Tr. 387.  Dr. Domingo described the nature and symptoms of Stigall's medical condition as "low blood pressure causing severe on/off dizziness especially with sudden change of positions or prolonged standing."  Tr. 387.   In addition to Stigall having low blood pressure, Dr. Domingo indicated that Stigall had a positive tilt table test.  Tr. 387.  Dr. Domingo reported that he had referred Stigall to a neurologist and a cardiologist.  Tr. 387.  Dr. Domingo noted that Stigall had been prescribed midodrin as needed but noted that the medication had not helped so Stigall quit taking it after a few weeks.  Tr. 388.  Dr. Domingo opined that:

> [D]ue to uncontrolled symptoms of hypotension – i.e., dizziness – patient is not safe to work in places that require full alertness and prolong[ed] standing with frequent changing of positions, i.e., supine or sitting to upright position or bending down, etc.

Tr. 388.

### *February 11, 2013, opinion*

In his February 11, 2013, entitled "Dizziness Medical Source Statement," Dr. Domingo stated that the average frequency of Stigall's dizziness was 7 times per week with a typical episode lasting 15 minutes.  Tr. 694.  Dr. Domingo indicated that Stigall did not always have a warning of his impending dizziness and there were no precipitating factors.  Tr. 694.  Dr. Domingo stated that the following symptoms were associated with Stigall's dizziness: visual disturbances; mental confusion/inability to concentrate; fatigue/exhaustion; falling; and anxiety.  Tr. 694.  Dr. Domingo indicated that following an episode of dizziness, Stigall experiences after-effects of confusion, exhaustion and paranoia, with those after-effects lasting an hour.  Tr. 694.  Dr. Domingo indicated that Stigall's dizziness episodes caused "difficulty walking."  Tr. 694.

Dr. Domingo indicated that Stigall did not have a history of injury during a dizziness episode but would require more supervision than an unimpaired worker.  Tr. 694.

Dr. Domingo stated that Stigall's associated mental problems included depression, irritability, social isolation, poor self-esteem, short attention span, memory problems, and behavior extremes.  Tr. 695.  Dr. Domingo opined that Stigall would need to take 5-10 minute unscheduled breaks every 30 minutes during an 8-hour workday; would be off-task 25% of the workday; and would be absent from work more than 4 days per month.  Tr. 695.

### b.  Consultative examining physicians/psychologists

*Dr. Sushil M. Sethi, M.D.*

On March 21, 2012, Dr. Sethi saw Stigall for a consultative evaluation.  Tr. 645-651. Stigall had last worked in 2007.  Tr. 645.  Regarding his lightheadedness, Stigall advised Dr. Sethi that, while he was at work, he was on a ladder and started feeling very dizzy and blurry. Tr. 645.  He gradually came down from the ladder and was seen by his personal physician and then sent to the hospital.   Tr. 645.  Stigall indicated that he was afraid to be on ladders or around people because he was afraid he would get dizzy and not remember things.  Tr. 645.  Stigall also reported that, "[a]t times, his hips go numb and he thinks he drops things."  Tr. 645.  Stigall indicated he had not had any paralysis or loss of control of his extremities.  Tr. 645.  Stigall indicated that his hypertension started in 2007 and stated that sometimes he has aches and pains on the top of his head and feels like he is floating.  Tr. 645.

Dr. Sethi's physical examination findings were relatively normal.  Tr. 646-647.  Dr. Sethi's impression was: (1) history of dizziness, possible history of vestibular symptomatology; and (2) history of gastric ulcer and colon polyps.  Tr. 647.  Dr. Sethi opined:

> Based on my objective findings, the claimant's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying and handling objects

and traveling is limited due to feeling[s] of dizziness and possible periodic vestibular symptoms.  His hearing and speaking are normal.

Tr. 647.

### James F. Sunbury, Ph.D.

On February 26, 2009, Dr. Sunbury conducted a psychological consultative evaluation. Tr. 400-403.  Stigall reported that he left his job as a chemical machinist in October 2007 because he was lightheaded.  Tr. 401.  As far as daily activities, Stigall indicated that he wakes at 6:30 a.m.; sees his children off to school; does dishes, cooking, laundry and cleans the house; he and his wife share the grocery shopping; and he reads, listens to music, and goes on the computer with his children.  Tr. 402-403.  His wife manages their money.  Tr. 403.  Stigall indicated that he is "on the go all of the time."  Tr. 403.  Although he reported feeling lightheaded all the time, he stated he still liked to take long walks or jog.  Tr. 403.  Stigall indicated that he did not belong to any clubs or organizations.  Tr. 403.  Considering psychological and social factors (not medical or physical impairments), Dr. Sunbury concluded that Stigall had no work-related impairments.  Tr. 403.

### Jennifer Haaga, Psy.D.

On October 19, 2011, Dr. Haaga conducted a psychological consultative evaluation.  Tr. 628-635.  Stigall relayed to Dr. Haaga that he was applying for social security disability because of a "mystery disease."  Tr. 628.  Stigall indicated that his symptoms included feeling as if the top of his head is floating off into space; missing a step while going up the stairs; problems with fatigue, standing and balance; dropping things; memory problems; and numbness in his lips.  Tr. 630.  Stigall stated that the first two weeks after his first episode of dizziness was the worst.  Tr. 630.  Stigall stated that he overdosed on Klonopin but didn't mean to.  Tr. 630.  Stigall said he worries about finances.  Tr. 630.  Stigall stated that his daily activities consisted of reading,

checking Facebook, playing games on the computer, checking the news, doing dishes, cooking, and doing laundry.  Tr. 631.  He stated he was a "workaholic" so he had to find something to do.  Tr. 631.  Dr. Haaga noted that Stigall indicated that "his 'mystery disease' symptoms have improved since they first developed four years ago but feels that his memory has declined and he would not be able to work in his previous line of work due to the possible dangers involved."  Tr. 634.  Stigall also indicated that he "feels that the fatigue is a significant problem for him and it would make it difficult for him to perform jobs that would lead to physical exertion."  Tr. 634.

Dr. Haaga's diagnoses included major depressive disorder, recurrent, mild and generalized anxiety disorder.  Tr. 633.  Dr. Haaga noted that it was not clear what was causing Stigall's symptoms but she felt that he could benefit from mental health treatment and learning to cope with his symptoms.  Tr. 633.   With respect to work-related abilities, Dr. Haaga opined that: (1) Stigall's ability to understand, remember and follow instructions was mildly impaired; (2) Stigall's ability to maintain attention, concentration, persistence, and pace to perform routine tasks was moderately impaired; (3) Stigall's ability to relate to others, including fellow workers and supervisors, was moderately impaired; and (4) Stigall's ability to withstand the stress and pressures associated with day-to-day activity was mildly impaired.  Tr. 634-635.

### c. Reviewing physicians/psychologists

*Steve E. McKee, M.D.*

On September 14, 2011, state agency reviewing physician Dr. McKee completed a Physical Residual Functional Capacity Assessment.  Tr. 73-74.  Dr. McKee opined that Stigall had no exertional, manipulative, visual or communicative limitations.  Tr. 73-74.  Dr. McKee opined that Stigall had the following postural limitations: frequent climbing of ramps/stairs, frequent balancing and never climbing ladders, ropes, and scaffolds.  Tr. 73.  Dr. McKee's

10

postural limitations were based on Stigall's frequent dizziness and lightheadedness from chronic hypotension.  Tr. 74.  Dr. McKee also opined that due to Stigall's dizziness, Stigall must avoid all exposure to hazards such as machinery and heights.  Tr. 74.

Upon reconsideration, on March 27, 2012, state agency reviewing physician Gerald Klyop, M.D., reaffirmed Dr. McKee's opinion by concluding that Stigall had the same limitations as found by Dr. McKee.  Tr. 103-104.

_Karen Steiger, Ph.D._

On December 5, 2011, state agency reviewing psychologist Dr. Steiger completed a Psychiatric Review Technique (Tr. 71-72) and Mental RFC Assessment (Tr. 74-76).  In the Psychiatric Review Technique, Dr. Steiger considered Listing 12.04 (Affective Disorders) and Listing 12.06 (Anxiety-Related Disorders) but concluded that Stigall's impairments did not meet or equal a Listing.  Tr. 71.  Dr. Steiger found that Stigall had mild restrictions in activities or daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  Tr. 71.  Dr. Steiger found no episodes of decompensation of extended duration.  Tr. 71.

In her Mental RFC Assessment, Dr. Steiger concluded that Stigall had no understanding and memory limitations and no adaption limitations.  Tr. 75.   In the area of sustained concentration and persistence, Dr. Steiger found that Stigall was moderately limited in his ability to maintain attention and concentration for extended periods and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 75. Dr. Steiger explained that Stigall's depressive and anxious symptoms reduced his concentration and persistence from optimal levels but was capable of performing routine tasks in

settings that have a static routine without strict time or production demands.  Tr. 75.  In the area

of social interaction, Dr. Steiger opined that Stigall was moderately limited in his ability to

interact appropriately with the general public and in his ability to accept instructions and respond

appropriately to criticism from supervisors.  Tr. 75.  Dr. Steiger indicated that, due to Stigall's

social interaction limitations, Stigall would work best in positions that do not require much

public interaction or close supervision.  Tr. 75-76.

Upon reconsideration, on April 2, 2012,  state agency reviewing psychologist Caroline

Lewin, Ph.D., reaffirmed Dr. Steiger's opinion by concluding that Stigall had the same

limitations as found by Dr. Steiger. Tr. 101-102, 104-106.

**C.**  **Testimonial evidence**

**1.**  **Plaintiff's  testimony**

Stigall was represented at and testified at the hearing.  Tr. 39-42, 43-56.  Stigall described

his feelings of lightheadedness and dizziness.[7]  Tr. 43-44.  He said that, by lightheadedness, he

means that he feels as though the top of his head floats off in space.  Tr. 43.  Dizziness to Stigall

means the room is spinning.  Tr. 43.  Stigall indicated that he constantly feels as though the top

of his head is floating.  Tr. 43, 45.  Also, sometimes he has a "scary" feeling that, when climbing

up the stairs, he thinks there is another step there but there isn't one and he feels as if everything

drops down.  Tr. 43, 45.  He indicated that sometimes he experiences that feeling two or three

times a day but sometimes not at all.  Tr. 43, 45, 50.  When the feeling happens, if he is not

sitting down, he will sit down.  Tr. 45-46.  He said the feeling lasts about two to three minutes.

Tr. 45, 50.  However, the first time he experienced one of his attacks, which occurred while he

was at work, it lasted over an hour.  Tr.  50.  Following that first attack, he underwent a tilt test.

Tr. 50.

---

[7] Stigall also discussed his other medical problems, including gastrointestinal and prostate problems.  Tr. 46.

Stigall is unaware of anything that triggers his feeling of lightheadedness.  Tr. 44.  He indicated that his blood pressure is always low but, when he has the symptoms of lightheadedness that he described, his blood pressure does not drop below normal.  Tr. 44.  Stigall indicated that he feels dizzy if he goes on long walks or goes grocery shopping.  Tr. 44.  If he goes grocery shopping, there are times when he has to sit or lean up against the cart.  Tr. 44.  He has fallen down only a couple of times.  Tr. 44.  Stigall does not usually limit himself because of his problems with lightheadedness and dizziness.  Tr. 44.  He just makes sure that when he goes up stairs he holds onto a railing or leans against the wall for support.  Tr. 44.  Stigall indicated that medication has not really helped his lightheadedness and dizziness and his physicians, including his neurologist, do not really know what is wrong with him.  Tr. 44-45.

Stigall indicated that, because of his physical medical problems, he has developed some problems with depression and anxiety.  Tr. 46-47.  He said he overdosed on Klonopin that had been prescribed by his neurologist.  Tr. 47.  He stated that, he was feeling very frustrated because he loved working and knew he was not going to be able to go back.  Tr. 47.  He also indicated that he has struggled with some memory problems.  Tr. 47.  Stigall indicated that he does not believe he could go back to work because he cannot stand for longer than two minutes because he gets very tired and is afraid of falling.  Tr. 49.  Stigall stated that he did not apply for disability until a year after he left work because he thought he would be able to go back to work.  Tr. 51.  Stigall said he is a workaholic and at home he still does work.  Tr. 47.  He does anything to stay busy.  Tr. 47.  For example, he does the dishes and cleans the house.  Tr. 47.  However, he indicated that he cannot do anything for longer than 10 minutes because he gets weak and tired.  Tr. 50-51.  Stigall indicated he has a bit of a fluttering step at times and tends to wander to

his left.  Tr. 44, 56.  He is not sure but thinks it may be related to a steel plate that he has in his right leg.  Tr. 44, 56.

### 2.  Vocational Expert's testimony

Vocational Expert ("VE") Mary Harris testified at the hearing.  Tr. 57-62.  The VE described Stigall's past work.  Tr. 57.  The VE indicated that: (1) Stigall's past work as a line worker in a foundry was unskilled, heavy work per the Dictionary of Occupational Titles ("DOT") but was performed by Stigall at a medium level; (2) Stigall's past work as a communications equipment installer was skilled, heavy work; and (3) Stigall's past work as a machine etcher was semi-skilled, medium work per the DOT but was performed by Stigall at the heavy level.  Tr. 57.

The ALJ then asked the VE to assume an individual of Stigall's age, education and work experience with no exertional limitations but who is limited to frequent climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent balancing; must avoid all exposure to hazards such as operational control of moving machinery and unprotected heights; limited to simple routine and repetitive tasks; and limited to superficial interaction with the public and coworkers.  Tr. 58.  The VE indicated that the described individual would be unable to perform Stigall's past work.  Tr. 58.  The VE indicated, though, that there were medium, SVP 2[8] jobs in the national economy that the described individual could perform, including (1) cleaning positions, with 32,000 available in Ohio and 800,000 nationwide; (2) machine feeder, with 4,400 available in Ohio and 88,000 nationwide; and (3) groundskeeper, with 6,200 available in Ohio and 320,000 nationwide.  Tr. 58-59.

---

[8] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2.  *Id.*

For his second hypothetical, the ALJ asked the VE to take the first hypothetical but assume that the individual is limited to light exertional work.  Tr. 59.  Without regard to whether there were transferable skills, the VE indicated that there were light, SVP 2 (and lower), jobs that the described individual could perform, including (1) hand packer, with 10,000 available in Ohio and 175,000 nationwide; (2) bench assembler, with 8,500 available in Ohio and 105,000 nationwide; and (3) light cleaning positions, with 23,000 available in Ohio and 700,000 nationwide.  Tr. 59-61.

The VE indicated that employers generally tolerate employees being off task no more than 10% of the workday and employers generally tolerate no more than 2 unexcused or unscheduled absences per month on a consistent basis.  Tr. 61.  The VE also indicated that, if an individual needed to take a 5 to 10 minute break every 30 minutes, there would be no jobs available to that individual.  Tr. 62.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

---

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[10] claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[11] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

---

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[11] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

# IV. The ALJ's Decision

In his March 15, 2013, the ALJ made the following findings:[12]

1.  Stigall meets the insured status requirements through December 31, 2012. Tr. 20.

2.  Stigall has not engaged in substantial gainful activity since October 12, 2007, the alleged onset date.  Tr. 20.

3.  Stigall has the following severe impairments: orthostatic hypotension and major depressive disorder.[13]  Tr. 21.

4.  Stigall does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments, including 2.01 (special senses), 4.01 (cardiovascular system), 6.01 (genitourinary impairments), 12.04 (affective disorders).  Tr. 22-23.

5.  Stigall has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: frequent climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; frequent balancing; avoid all exposure to hazards such as operational control of moving machinery and unprotected heights; limited to simple routine repetitive tasks; superficial interaction with public coworkers; and five percent off task during work period.  Tr. 23-27.

6.  Stigall is unable to perform past relevant work. Tr. 27.

7.  Stigall was born in 1957 and was 50 years old, defined as a younger individual closely approaching advanced age, on the alleged disability onset date.  Tr. 27.

8.  Stigall has a limited education and is able to communicate in English.  Tr. 28.

9.  Transferability of job skills is not material to the determination of disability.  Tr. 28.

10. Considering Stigall's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Stigall could perform, including cleaning positions, machine feeder, and groundskeeper.  Tr. 28.

---

[12] The ALJ's findings are summarized.

[13] The ALJ found other impairments, including gastrointestinal-related complaints; kidney, bladder, prostate, bowel and abdomen problems; and musculoskeletal pain to be non-severe impairments.  Tr. 21.

Based on the foregoing, the ALJ determined that Stigall had not been under a disability from October 12, 2007, through the date of decision.  Tr. 29.

## V. Parties' Arguments

### A.    Plaintiff's arguments

Stigall contends that the ALJ erred in weighing the medical opinion evidence, including the opinions offered by his treating physician Dr. Domingo.  Doc. 15, pp. 8-13; Doc. 17.  He argues that the ALJ's reliance on a lack of objective findings and inconsistencies with the record as a whole to discount Dr. Domingo's opinion is inadequate because there were objective findings, i.e., a positive tilt test, and because Dr. Domingo's opinions were consistent with the opinion of Dr. Sethi, a consultative examining physician.  Doc. 15, pp. 8-13; Doc. 17.  He also argues that the ALJ gave no weight to the non-examining physicians[14] but weight to the non-examining psychologists and thus improperly focused on Stigall's mental impairments rather than his physical symptoms, i.e., lightheadedness and dizziness.  Doc. 15, pp. 12-13; Doc. 17.  Stigall also contends that, based on the ALJ's improper weighing of the medical opinions, the ALJ improperly substituted his own judgment for that of his treating and examining physicians.  Doc. 15, pp. 9-11; Doc. 17.

Stigall also argues that the ALJ erred in assessing his credibility because the ALJ based his credibility decision on his belief that normal cardiac and neurological signs did not confirm frequent dizziness that occurs with orthostatic hypotension.  Doc. 15, pp. 13-14.

Stigall also argues that the ALJ erred at Step Five because he failed to rely on a VE hypothetical that accurately portrayed Stigall's limitations, i.e., one that incorporated the limitations contained in Dr. Domingo's opinions.  Doc. 15, pp. 14-16.

---

[14] Stigall contends that the ALJ gave no weight to the state agency reviewing physicians.  Doc. 15, p. 10.  The ALJ, however, did give them weight, albeit "little weight."  Tr. 27.

**B.**    **Defendant's arguments**

In response, the Commissioner argues that the ALJ properly weighed Dr. Domingo's medical opinion and found it not consistent with the benign findings in his treatment notes and not consistent with the evidence in the record as a whole, which showed overall benign objective imaging results.  Doc. 16, pp. 7-9.  The Commissioner also argues that, other than the unsupported opinions of Dr. Domingo and Dr. Sethi, Stigall has pointed to no medical opinion supporting a more restrictive RFC finding than found by the ALJ.  Doc. 16, p. 9.

The Commissioner also argues that that the ALJ properly assessed Stigall's credibility relying on a lack of objective medical findings to support the extent of limitations as alleged by Stigall as well as evidence of conservative medical treatment and Stigall's activities of daily living.  Doc. 16, pp. 10-13.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.**    **The ALJ's analysis of the medical opinion evidence is insufficient to allow for meaningful judicial review of the disability determination**

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).

If controlling weight is not provided, an ALJ must apply certain factors to determine what weight should be given to the treating source's opinion,[15]  and the Commissioner's regulations also impose a clear duty on an ALJ always to give good reasons in the notice of determination or decision for the weight given to treating source opinions. *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007) .  "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996

---

[15] The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion. *Bowen*, 478 F.3d at 747; 20 C.F.R. § 404.1527(c).  Also, when controlling weight is not given a treating source opinion, these same factors are used to determine the weight to give any medical opinion.  20 C.F.R. § 404.1527(c) & (e).

SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).  "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544).

Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).  An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 939-940 (citing *Blakely v. Comm'r of Soc Sec*, 581 F.3d 399, 407 (6th Cir. 2009) (internal quotations omitted)).  Inasmuch as 20 C.F.R. § 404.1527 creates important procedural protections for claimants, failure to follow the procedural rules for evaluating treating physician opinions will not be considered harmless error simply because a claimant may appear to have had little chance of success on the merits. *Wilson*, 378 F.3d at 546-547.

In discussing Dr. Domingo's December 2, 2008, and February 11, 2013, opinions, the ALJ stated:

> Treating physician, Evillo Domingo, MD, opined the claimant could not work due to uncontrolled hypotension and dizziness, which he said resulted in limitation for work requiring full alertness or prolonged standing with frequent changes in position.  The opinion was submitted on December 2, 2008 (8F).[16]  Dr. Domingo submitted a second opinion on February 11, 2013.  He opined the claimant's dizziness occurs several times a week and episodes last for about 15 minutes each time with the after affects each lasting for an hour.  Dr. Domingo further opined the claimant would miss over four days of work per month and be off-task about

---

[16] Dr. Domingo's December 2, 2008, opinion is Exhibit 6F (Tr. 386-399) not 8F (Tr. 404-417).  Exhibit 8F is a March 3, 2009, Psychiatric Review Technique completed by a state agency psychologist.  Tr. 404.

25% of the time (22F).  Dr. Domingo's opinion is not consistent with the benign exam results he reported in the treatment notes (10F, 17F, and 21F).  His opinion is also inconsistent with the record as a whole, which shows overall benign objective imaging results (2F/11, 4F/8-9, 6F/6 & 12-13, and 11F/73-74).

Tr. 27

Dr. Domingo started treating Stigall on March 23, 2006 (Tr. 387), and continued treating him through January 2013 (Tr. 691).  In light of Dr. Domingo's status as a treating physician, the ALJ's analysis of his opinions falls short of satisfying the treating physician rule and is insufficient to allow for meaningful judicial review.

Notably, the ALJ did not indicate what, if any, weight he assigned to either Dr. Domingo's or Dr. Sethi's opinions.   The ALJ determined that, "overall," there were "benign objective imaging results" and concluded that Domingo's opinions, including his opinion that Stigall would have limitations in prolonged standing, were therefore not consistent with the record as a whole.  Tr. 27.  While the ALJ appeared to discount Dr. Domingo's opinions because, "overall," there were "benign objective imagining results," the ALJ acknowledged elsewhere in his decision that a tilt table test had revealed orthostatic hypotension (Tr. 25), which Dr. Domingo indicated was the cause of limitations in Stigall's ability to stand, change positions, stay alert, and bend (Tr. 388).[17]   Moreover, in discussing Dr. Domingo's opinions, the ALJ did not acknowledge consistencies between the opinions offered by Dr. Sethi, a consultative examining physician, and Dr. Domingo, or discuss why the consistencies between those opinions did not warrant providing some weight to those opinions.  *See* 20 C.F.R. § 404.1527(c)(4) (one of the factors to consider when weighing opinion evidence is consistency).

---

[17] The ALJ erroneously stated that the tilt table test was "completed in 2007, well before the alleged onset of disability."  Tr. 25.  As indicated by the ALJ, Stigall's alleged a disability onset date of October 12, 2007 (Tr. 18) and the tilt table test occurred six days later on October 18, 2007 (Tr. 363).

The ALJ assigned little weight to the opinions of the state agency reviewing physicians who offered opinions regarding Stigall's physical impairments, finding that the physicians had not "adequately address[ed] the claimant's 'attacks' or the effect that the frequency and duration of the episodes would have on the claimant being off-task." Tr. 27.  Since the ALJ provided only little weight to the state agency reviewing physicians' opinions and appeared to assign no weight to the treating source and examining source physical impairment opinions, it is unclear upon what medical opinion evidence the ALJ relied to formulate Stigall's RFC.

Furthermore, both Dr. Domingo and Dr. Sethi opined that Stigall would have limitations in his ability to stand and walk.  Tr. 388, 647, 694.[18]  However, the ALJ included no exertional limitations to account for limitations in Stigall's ability to stand or walk (Tr. 23) (finding that Stigall had the RFC to perform work at all exertional levels with some postural, environmental, and mental limitations) and/or failed to sufficiently explain why the treating source and examining source opinions were rejected notwithstanding the consistencies between the opinions.

An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, 661 F.3d at 939*-940.  Here, contrary to the treating physician rule and regulations for weighing and considering medical opinion evidence, the ALJ failed to explain sufficiently what, if any, weight he assigned to the opinions of Dr. Domingo and Dr. Sethi and failed to sufficiently explain how, in light of consistencies between Dr. Domingo's and Dr. Sethi's opinions, the ALJ concluded that Dr. Domingo's opinions were inconsistent with the record as a whole. Thus, the

---

[18] For example, in March 2012, Dr. Sethi opined that Stigall's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying and handling objects and traveling was limited due to feeling of dizziness and possible periodic vestibular symptoms. Tr. 647.  Dr. Domingo opined that Stigall would be limited in his ability to stand for prolonged periods and would have difficulty walking.  Tr. 388, 694.

Court is unable to assess whether there is substantial evidence to support the ALJ's decision. *Cole*, 661 F.3d at 939-940; *see also Wilson*, 378 F.3d at 546-547.  Accordingly, reversal and remand is warranted for further proceedings consistent with this Opinion.

**B.     Other issues**

Stigall also challenges the ALJ's credibility assessment and Step Five finding based in part upon the opinion rendered by his treating physician.  Because remand is warranted for further evaluation of the medical opinion evidence, including Stigall's treating physician opinions, this Opinion does not address Stigall's additional arguments which may be impacted by further proceedings on remand.  *See Trent v. Astrue*, 2011 WL 841538, *7 (N.D. Ohio Mar. 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

**VII. Conclusion**

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings.[19]

August 18, 2015

_____
Kathleen B. Burke
United States Magistrate Judge

---

[19] This opinion should not be construed as requiring a determination on remand that Stigall is disabled.